UNITED STATES

v.

Ronald Kenneth ROBERTS, 457 19 1308, Seaman Apprentice (E–2), U. S. Navy

and

Susan Lynn Sutek, 261 61 7001, Interior Communications Fireman Apprentice (E–2), U. S. Navy.

NMCM 81 2916, 81 3121.

U. S. Navy-Marine Corps Court of Military Review.

Sentences Adjudged 5 Feb. 1981 and 30 Jan. 1981.

Decided 30 June 1982.

MAJ Joseph M. Poirier, USMC, Appellate Defense Counsel.

LCDR David S. Durbin, JAGC, USNR, Appellate Defense Counsel.

LTCOL J. Dewayne Littlejohn, USMC, Appellate Government Counsel.

Before BOHLEN, BYRNE and MALONE, JJ.

BYRNE, Judge:

We have joined these cases together for review purposes because the facts that relate to the issues are the same.

RONALD KENNETH ROBERTS    NMCM No. 81 2916
457 19 1308
Seaman Apprentice (E–2)
U. S. Navy

and

SUSAN LYNN SUTEK    NMCM No. 81 3121
261 61 7001
Interior Communications Fireman Apprentice (E–2)
U. S. Navy

Fireman Apprentice Sutek and her husband, Seaman Apprentice Roberts, were both tried by separate special courts-martial for unauthorized absences that began on 20–21 February 1980 and terminated on 19 November 1980. Both were tried by military judge sitting alone.

Fireman Apprentice Sutek, who was tried first, pled not guilty and asserted the defense of duress. That defense was based on her fear of being physically forced to undergo a shipboard initiation ceremony in which she was to be "greased" and inked. She was found guilty. She sought to remain in the service but was sentenced to discharge from the Navy with a bad-conduct discharge. She also was sentenced to reduction to pay grade E–1, restriction and hard labor without confinement (to run concurrently) for 2 months and forfeiture of $100.00 per month for 2 months. The convening authority and supervisory authority approved the sentence.

Thereafter, Seaman Apprentice Roberts pled guilty at his special court-martial, pursuant to a pretrial agreement, and requested a bad-conduct discharge. He was sentenced to discharge from the Navy with bad-conduct discharge, confinement at hard labor for 4 months, forfeiture of $250.00 per month for 4 months, and reduction to pay grade E–1. The convening authority approved the sentence, but, pursuant to the pretrial agreement, suspended the confinement in excess of 60 days. The supervisory authority approved the sentence as partially suspended by the convening authority.

There are a number of assignments of error pertaining to these cases. We consider that two of them have merit and warrant discussion.

## I

### DID THE EVIDENCE OF RECORD FAIL TO PROVE FIREMAN APPRENTICE SUTEK GUILTY OF UNAUTHORIZED ABSENCE IN LIGHT OF HER TESTIMONY CONCERNING A FORTHCOMING INITIATION?

We respond affirmatively. Three lettered sub-issues are discussed in our resolution of this assignment of error.

### A.

### IS THE INITIATION SUCH AS TO JUSTIFY A REASONABLY-GROUNDED FEAR OF SERIOUS BODILY INJURY?

■ Fireman Apprentice Sutek understood the initiation had two aspects:

(1) ... they tie you down and they pull your pants off and put a grease gun in your seat and pump you full of grease and coffee grounds and cigarette butts and anything that will fit through the tubing; and

(2) ... they either hang you upside down by your ankles or they bend you over and pull your pants off and cover your crotch area with printer's ink.

Initially, we reject suggestions that this type of physical abuse, because it is classified as an "initiation" or "long-standing ritual" is exempt from the defense of duress.

We hold that the threat of the initiation described in this case, to be performed upon appellant, was justification for a reasonably-grounded fear of receipt of serious bodily injury on her part. *See* paragraph 216g, *Manual for Courts-Martial, 1969 (Rev.)* (MCM).

### B.

### DID FIREMAN APPRENTICE SUTEK HAVE A REASONABLE OPPORTUNITY TO AVOID THE UNAUTHORIZED ABSENCE WITHOUT SUBJECTING HERSELF TO THE INITIATION?

■ Paragraph 216f of the MCM states the following:

If the accused has a reasonable opportunity to avoid committing the act without subjecting himself to the threatened danger, his act is not excusable.

*See also United States v. Guzman*, 3 M.J. 740 (N.C.M.R. 1977), *rev'd on other grds.*, 4 M.J. 115 (C.M.A.1977).

Consequently, if reporting the threatened initiation to higher authority would have prevented the initiation, the defense of duress would be inapplicable.

But Fireman Apprentice Sutek testified that she had already been subjected to physical and verbal sexual harassment and her complaints to her division officer, and a chaplain, and the Command Master Chief had not resolved the problem. As regards reporting the incident further up the chain of command, she testified:

Q. [Military Judge] In your mind you must have been sure that if you talked to the Captain and told him about these incidents that you have told the court about that he would have stopped it; didn't you?

A. [Fireman Apprentice Sutek] Something like ... [the initiation] really can't be stopped. It's going to happen. I knew that afterwards there could have been disciplinary action taken but it was something that I felt could not be stopped and I still don't think that it can. I think that the men are still going to do it. . . .

There is ample unrebutted and uncontradicted testimony to conclude that the intermediate chain of command was not responsive to appellant's previous allegations of physical and verbal sexual harassment. Consequently, even if Fireman Apprentice Sutek had reported the imminent threat of the initiation to her commanding officer, she could not have prevented the initiation. We conclude that she did not have a reasonable opportunity to avoid the unauthorized absence without subjecting herself to the initiation.

## C.

## WAS THERE A REASONABLY–GROUNDED FEAR OF AN IMMEDIATE INITIATION AND DID THIS FEAR COMPEL THE ABSENCE?

■ In order for coercion or duress to constitute a defense, the accused had to possess a reasonably-grounded fear that she would suffer serious bodily injury if she did not absent herself from the ship. Paragraph 216*g*, MCM; *United States v. Roby*, 23 U.S.C.M.A. 295, 49 C.M.R. 544 (1975).

The record of trial shows that there was an intent on the part of the firemen on the ship to conduct this initiation upon Fireman Apprentice Sutek. She testified that she realized they were serious when they "oiled" her during general quarters:

I was on the headsets to the pilot house during General Quarters the first time we were out at sea. And the men had stated before that they were going to . . . . [initiate me]. And at this time there were three men in my shop that grabbed my wrists and tied them up with a cord and they hinched me to the piping on the overhead and there was a small hole in my dungarees near the crotch area that was caused from battery acid and they stuck the nozzle of an oil can into this hole and they pumped my crotch area full of oil. And then they filled my socks and shoes, and my breast pockets, and my dungaree pockets, including the front and back. And they opened up my shirt to make sure that my tee shirt was saturated.

[Reporter's Note: The witness was crying.]

I was afraid that they were going to rip my clothes off and it was going to get out of hand. I screamed and I protested. My headsets had fallen off to the floor and anyone that was on the headsets in the pilot house heard what was going on. I wasn't sure how to react except that I was scared to death. I wasn't sure what they were going to do after. But they left me hanging from the pipes for awhile; until all of them had a good

laugh and they made sure that my uniform was pretty well ruined with the oil. And then they let me down but kept my hands tied and one of the other IC-men threw me over his shoulder and took me into one of the back rooms and they locked and bolted the door shut. And he set down and talked to me for awhile until I calmed down. And that was basically the end of the oiling.

Fireman Apprentice Sutek testified further that statements of an intent to "initiate" her started to become more frequent after the "oiling." She was told that she was "next" following Cheno's (phonetic) initiation. Two days after Cheno's initiation, she absented herself from the ship.

There are other factors identified by Fireman Apprentice Sutek while under cross-examination that could have motivated Fireman Apprentice Sutek to have absented herself: verbal and physical sexual harassment; inability to collect married BAQ because she and her husband were both living aboard the ship; absence of COMRATS; lack of discipline aboard the ship; lack of support from her supervisors and ship's counsellors when she complained about sexual harassment; and tension headaches requiring medication. As regards the latter, a doctor had prescribed bed rest for her but the command had denied her husband permission to drive her home during working hours. It is true that in her testimony she acknowledged that this denial was the "last straw." She also acknowledged that she was thinking that by absenting herself she was getting away from the sexual and verbal abuse she had been receiving "from the men." Further, in congressional correspondence the accused had acknowledged that denying her husband permission to drive her home during working hours "was the straw that broke the camel's back."

These factors would indicate that something other than, or in addition to, a reasonably-grounded fear of serious bodily injury compelled her to absent herself, were it not for the fact that her testimony proceeds further:

Q. [Trial Counsel] Wasn't that [the command refusal to permit her husband to take her home for bed rest] the immediate cause of your unauthorized absence?

A. Well, when we left then we were upset about that and I was afraid that if I returned to work the following day that that would be my day that I would be ... [initiated].

Further, she denied that the refusal of the command to permit her husband to drive her home and the general disillusionment with the command caused her to absent herself. However, these factors *did* convince her that any appeal through the chain of command to prevent the initiation would have been a futile act with unfavorable repercussions.

Her failure to emphasize in her congressional correspondence the initiation as the singular motivation for the absence is understandable. The letter was a general complaint of sexual harassment aboard the ship. Further, when questioned as to why she didn't discuss the threat of the initiation in more detail, the appellant stated:

Well, I was afraid to. It was a touchy situation. I was afraid to bring something up like that to the Secretary of the Navy or my congressman; it just really didn't seem like the thing that you would talk to them about or that you would bring up to them because it was embarrassing. I was afraid to mention something like that to someone so senior; to specify what it was.

Fireman Apprentice Sutek did not surrender for 273 days. If she had surrendered after 180 days, she would not, at that time, have been returned to her ship—the source of the threatened serious bodily injury. NAVOP 125/77. We have considered this fact in determining whether the fear of the initiation really compelled the absence. *United States v. Clark,* No. 79 1948 (NCMR 30 May 1980). We have also considered the significant fact that the military judge was present to observe appellant's demeanor on the stand.

Nonetheless, we believe the appellant's version of the events and conclude that she had a reasonably-grounded fear of an immediate initiation and that this fear compelled her absence.

## II

UNDER THE FACTS AND CIRCUMSTANCES OF SEAMAN APPRENTICE ROBERTS' CASE, IS ANY SENTENCE OTHER THAN "NO PUNISHMENT" AN INAPPROPRIATELY SEVERE SENTENCE?

■ Seaman Apprentice Roberts, Fireman Apprentice Sutek's husband, testified during his presentencing hearing:

I would like to—sir, I think you should know right from the start that I no longer feel as if I want to stay in the Navy. I am hoping you will discharge me. When I enlisted in the Navy in July of '79 I did so with great enthusiasm. My enthusiasm did not wane after reporting aboard the USS DIXON AS37. But while onboard, I met a fellow sailor, Fireman Apprentice Susan L. Sucheck [sic] who had also just arrived and with whom I soon fell in love with. She was subjected to a great deal of unwarranted sexual harassment which on several occasions amounted to sexual abuse. The command was very unresponsive to her situation and I was looked upon with disfavor and when I tried to get involved and help her I was looked upon very disfavorably. The command was only just learning to deal with a mixed crew and with women, and certainly didn't know how to handle the kinds of situations that have arisen. I believe that my wife and I are a prime example of this. We finally got married only a few days before we decided we had to go UA. Our marriage was not a reason for our going UA, I believe it was the opposite, that marriage would strengthen our relationship and hopefully stop the harassment. Upon returning the next morning, we were met by a command that simply could not handle our marriage and it would not even let me drive my wife home when she got sick. I

believe my wife's sickness was because of nervousness and tension. She had been sick for the last two weeks throwing up and constantly had headaches. I think that this was due to the fact that in her division the men in her division had planned an initiation . . . . She believed like another new worker the day before she was the next in line so as a result we went UA to get away from all of this and we surrendered ourselves on November 19th 1980, to put this Navy experience behind us and out of our lives.

My wife went to court last week, she received a BCD, a 60 day restriction and this week I am before the court. I personally do not believe that that is the way it should have been handled, but that is what came out of it. A letter that we wrote to our congressman, commanding officer, and others has been given to you which goes into much detail about what happened. It is absolutely true and I swear to that now under oath.

The letter explains our dilemma and shows why my wife and I had to leave. I am a hard working young man, I have had no previous record of being in trouble, I believe what I have done was in my best interest of my wife and myself. If need be, I believe I'd do it again. I have seen a lot of things in 22 years of living, I have seen my family fall apart, I have seen my brother with a brain tumor, I have seen my mother shoot herself. Through joining the Navy, I would never have believed the injustice that my wife and I have received. I am here solely for the purpose of getting this over with and to start my life over once again, with my wife and my child who is now on the way.

Seaman Apprentice Roberts would not have been an unauthorized absentee but for the physical and verbal sexual harassment of his wife and the immediate threat to "initiate" her as previously described. Further, she has not been proven guilty beyond a reasonable doubt, before this Court, of the unauthorized absence she began with her husband. Consequently, he would not have committed this offense if the sexual harass-

ment and immediate threat to the physical safety of his wife had not been present. While this is no defense to *his* absence, we do conclude that a *sentence* of "no punishment" is appropriate in this case.

Appellate Government counsel has argued that should we hold no punishment to be appropriate in this case, this Court would, in effect, be condoning the actions of appellant. To the contrary, we do not. Instead, it is because we cannot condone the actions of his shipmates and immediate supervisory personnel that we determined no punishment to be appropriate in this case.

In concluding, we firmly believe that the interests of high morale, good order, and discipline in the Navy can only be served if these issues are resolved in this manner.

Accordingly, the findings of guilty and sentence of Fireman Apprentice Sutek are disapproved and the charges against her are dismissed. As to the findings of guilty in Seaman Apprentice Roberts' case, they are correct in law and fact and no error materially prejudicial to his substantial rights occurred. Therefore, they are affirmed. As to Seaman Apprentice Roberts' sentence, we affirm only so much of his sentence as provides for no punishment. All rights, privileges, and property of which these two appellants have been deprived shall be restored.

Senior Judge BOHLEN and Judge MALONE concur.