UNITED STATES, Appellee,

v.

Van HULLUM, Jr., Fireman Apprentice,
U.S. Navy, Appellant.

No. 42,615.
NMCM No. 81 0112.

U. S. Court of Military Appeals.

April 25, 1983.

For Appellant: *Lieutenant Commander William A. DeCicco,* JAGC, USN (argued); *Commander Matthew J. Wheeler,* JAGC, USN.

For Appellee: *Lieutenant William V. Cerbone, Jr.,* JAGC, USNR (argued); *Captain T.C. Watson, Jr.,* JAGC, USN, *Major Charles Wm. Dorman,* USMC (on brief); *Commander W.J. Hughes,* JAGC, USN.

*Opinion*

EVERETT, Chief Judge:

A military judge, sitting as a special court-martial, tried appellant on a charge consisting of five specifications of unauthorized absence, in violation of Article 86, Uniform Code of Military Justice, 10 U.S.C. § 886. Contrary to his pleas, Hullum was found guilty with some exceptions as to dates, and was sentenced to a bad-conduct discharge, confinement at hard labor for 4 months, and reduction to pay grade E–1. Although the judge recommended that Hullum's discharge be suspended "if while in confinement the accused demonstrates and expresses a willingness to complete his obligation to the Navy, to return to duty, and to honorably finish out his obligation," the convening authority decided not to do so. However, he did suspend confinement in excess of 90 days. After noting that he had considered "the recommendation of the military judge, the clemency petition submitted by defense counsel," and his staff judge advocate's review, the officer exercising general court-martial jurisdiction approved the action of the convening authority.

After the case reached the United States Navy-Marine Corps Court of Military Review, appellate defense counsel was granted four enlargements of time because of "extremely heavy caseload of counsel." Finally, appellate defense counsel submitted the case to the court below "without specific assignment of errors" and with a "waiver of oral argument." A few weeks later, the findings and sentence were affirmed by that court in a one-sentence opinion.

A petition for review was filed in our Court, after which appellate defense counsel simply "submit[ted] the case on its merits without specific Assignments of Error." Subsequently, we granted the petition on this issue, which we specified:

IN THE CIRCUMSTANCES OF THIS CASE AND CONSIDERING THE BROAD POWERS POSSESSED BY A COURT OF MILITARY REVIEW IN REGARDS TO THE FINDINGS OF FACT AND SENTENCE APPROVED BY A CONVENING AUTHORITY, WAS APPELLANT DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL BY DETAILED APPELLATE DEFENSE COUNSEL'S SUBMISSION OF THE RECORD OF TRIAL TO THE UNITED STATES NAVY–MARINE CORPS COURT OF MILITARY REVIEW WITHOUT ASSIGNMENT OF SPECIFIC ERROR AND WITH A WAIVER OF ORAL ARGUMENT?

Then, upon a motion by the appellate defense counsel seeking further guidance as to the matters with which the Court was concerned, we requested that briefs be filed on this issue:

WHETHER IN VIEW OF THE CIRCUMSTANCES OF THIS CASE AND THE BROAD POWER POSSESSED BY A COURT OF MILITARY REVIEW, THE APPELLANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL'S FAILURE TO BRIEF AND ARGUE THE ISSUE OF SENTENCE APPROPRIATENESS BEFORE U.S. NAVY–MARINE CORPS COURT OF MILITARY REVIEW.

I

Appellate Government counsel point out that appellant was convicted of unauthorized absence for these five periods: February 27 to 28, 1978; March 20 to April 20,

1978; May 12 to July 27, 1978; August 12, 1978, to November 27, 1979; and January 24 to 26, 1980. Moreover, Hullum had a prior conviction by a summary[1] court-martial for absence offenses. Consequently, according to the Government, it would have been frivolous for appellant to have argued appropriateness of the sentence in the Court of Military Review. Furthermore, since in every case the Court of Military Review has a statutory obligation to review appropriateness of the sentence, *see* Article 66(c), Uniform Code of Military Justice, 10 U.S.C. § 866(c), they can be presumed to have properly discharged their duty in that regard.

At first blush, these arguments seem plausible. Indeed, initially the question comes to mind why the military judge even recommended that the convening authority consider suspension of appellant's bad-conduct discharge. However, a more thorough examination of the record of trial reveals that this is not a routine case.

Appellant is a young sailor who was assigned to the USS SAMUEL GOMPERS. According to his testimony, his first absence was for only one day and resulted from his arrest and confinement by civil authorities on "a jaywalking ticket." His second absence commenced on March 20, when "my life was threatened aboard the USS Samuel Gompers (AD 37)." Even prior to this threat, Hullum had been experiencing racial prejudice and harassment at the hands of a Machinist's Mate Deen and "the people in my Division." Initially Deen had called appellant a "nigger" and had refused to apologize. "So, I wrote him up and he got busted down to E–3." Thereafter, appellant received two anonymous letters, the second of which arrived around March 20 and "said that they were going to kill me." Hullum also had been threatened verbally by Deen, who "told me he was going to get the Mafia after me." Appellant testified that he had shown a threatening "letter to my Chief," who then had told him "it was

all taken care of." However, despite this assurance, the threats had not ceased. Therefore, appellant had left on March 20 "believing that . . . [my] life was in danger."

Appellant returned to his home town of Rochester, New York, where on April 20, he turned himself in at a recruiting station. There, he talked to a Petty Officer, who stated that "he was going to put the ship under investigation because it was eleven to fifteen other guys had the same problem happen to them." Appellant was furnished an airplane ticket at the recruiting station and flew back to San Diego, where he reported to the Restricted Barracks.

On May 12, he went home once more after he had heard from the chaplain that "they wanted to send me back to my ship and I told them, 'No way,' because my life was in danger. And I felt that if I went back to the ship that they would kill me." On July 27, appellant again turned himself in at the recruiting station at Rochester, and he was given orders to return to San Diego and report back to his ship. Prior to receiving the orders, he had talked to the Commanding Officer of the Reserve Center in Rochester and had "explained to him what the situation was; that my life was threatened and I feared for my life." However, this official had told Hullum "there was nothing he could do; that he would give me some orders to report back in here."

Appellant did not get on the plane to San Diego "[b]ecause my life was in danger." Instead, he went home, and on November 27, 1979, was apprehended by civilian authorities. Soon after being returned to military custody, Hullum was granted leave so he could attend to some pressing family problems. He over-stayed his leave in order to get married, and a few days later he surrendered to military authorities. From the time he first left his ship on March 20, 1978, until his trial two years later, appellant had never been back to the USS SAM-

---

1. The promulgating order erroneously reflects under SENTENCE that appellant had a *special* court-martial conviction.

UEL GOMPERS; and he answered affirmatively when asked by his counsel: "Do you still fear for your life on that ship?"

On cross-examination, appellant insisted that threats had been made against his life. Twice, anonymous notes were put on his rack. Moreover, "Deen came and told me verbally that he was going to get the Mafia after me"; and on another occasion Deen had attempted to provoke a fight with him. Appellant described his mental state in this way:

> Yes, I was in danger ma'am. I wanted to do—I didn't want nobody to get hurt and I didn't want to get hurt. When somebody threatens my life and I do all I can to get it squared away and they wouldn't do nothing about it—well, it was time for me to leave.

Despite his complaints, "no action was taken against the persons that had threatened my life." Moreover, when appellant made a written request to see the Captain of the USS SAMUEL GOMPERS before his absences commenced, that request was "disapproved." As Hullum described his plight:

[M]y life was in danger and I just wanted somebody—since my life was in danger—they was getting me another command and ship me somewhere else that would have been fine. But they did not want to do that; they wanted to send me back to my ship.

As to the threatening notes, appellant testified that one had been put on his rack shortly before March 20, 1978, "but I disregarded that one 'cause they were just talking about beating me up. I wasn't worrying about that but then when they put this one here I'm talking about threatening to take my life—you know—a life is very—a very precious thing, you know?"

Appellant's wife corroborated Hullum's testimony that he had left his ship "because his life was threatened." Then, Ensign I.W. Harper testified that Hullum and Deen had worked for him when he was in charge of the "A" Division on the GOMPERS. At one point, appellant was working for Deen in that Division and Ensign Harper noticed some dissension:

There was some type of—something was going on between them; I don't know if it was a personality conflict or Deen didn't like Hullum, or Hullum didn't like Deen, but in most cases I would say the biggest fault was on Deen's part.

This witness had noticed "racial problems" and "racial slurs" in his division and throughout the ship. "[F]rom time to time, more frequently than it should have been, racial slurs was a fairly regular thing."

Boatswain's Mate Second Class Ackley testified that he had been working for several weeks before trial as Master at Arms in the "DR Barracks." Hullum

came down to me one night when I was on duty, and he stated to me that they had dressed his rack up again with KKK stuff. . . . I went up topside and it was—his rack was all taped up and there was a small paper in it that looked like a man with a head on that had "KKK" on the top of it. And it stated that, "This is your second warning nigger."

Hullum "told me—he said, 'This is the same thing that happened aboard ship; that is why I went UA.' And, then he said, 'I might have to do it again.'" When asked on cross-examination "what might have led up to these threats," Ackley replied that he did not know of anything that appellant had done and added: "That man don't bother nobody; he is the best worker I have seen in a long time." He also referred to two threats made against Hullum "when I was taking the man down the ladder." Questioned on redirect about appellant's character, Ackley responded that "he is an outstanding worker. He is practically a model sailor, except when people mess with him."

No rebuttal evidence was offered by the Government. However, in arguing on the merits, trial counsel contended "that in order to bring and prove a duress defense more would have to be shown than just some vague written threats signed by an anonymous person. There has been no showing of any physical violence that was offered to the accused." Contrariwise, the defense counsel contended:

He received a threat that he was going to be beaten up. But he wasn't too concerned about being beaten up. But he received another threat in the form of a letter that, in fact, his life was going to be taken. And it was at this point that— Did he just take off from the ship? No, he did not. He actually felt that his life was going to be taken but what he did was, he went to his Chief; maybe he could help. There was no help coming from his Chief. He tried to take it to his Division Officer; there was no help coming from him and it was at that point that he felt his life was too precious. I do not want my life to be taken and no one else cares so he left the ship. And the testimony is that he never returned to that ship; he turned himself in several times, there is no problem there. And everytime he turned himself in, and everytime he came back to the Naval Station he had no problems. As soon as he found out that he was going to go back to the ship, whenever it was, whether it was going to be in an airport or here in DR Barracks, wherever, as soon as he found out that he was going to go back to that ship he took off. He wasn't going to go back to that ship; he knew if he went back to that ship in his mind he was going to be killed. He didn't know exactly how it was going to be done but he, in his own mind, believed that it was going to be done; so, in fact, you Honor, a duress defense has been raised.

After hearing the arguments of counsel, the judge entered findings of guilty as to all five specifications—although with exceptions and substitutions as to three of the specifications. Finally, the defense offered various documents in evidence for mitigation and extenuation purposes. One of these was a written statement by Hullum which, among other things, included a description of some of the incidents described in his testimony on the merits. According to that statement, while appellant was on the USS SAMUEL GOMPERS, he had been threatened with a "greasing"—the type of hazing which was recently described and denounced in *United States v. Roberts and Sutek,* 14 M.J. 671 (N.M.C.M.R.1982), *rev'd.* (as to Roberts), 15 M.J. 106 (C.M.A.1983).

## II

■ Normally, a charge of unauthorized absence is proved by official records or testimony which establish that the accused was not present for duty. However, in exceptional cases, the mere absence of the accused is not conclusive as to his guilt. For example, impossibility may be a defense if unforeseeable physical circumstances prevented the accused from being present with his unit. In a few cases, necessity and duress have also been recognized as defenses to a charge of unauthorized absence. Thus, if an accused's continued presence endangers his life or that of a close family member, his absence may be excusable under some circumstances. *United States v. Palus,* 13 M.J. 179 (C.M.A.1982). In *United States v. Sutek, supra,* the Court of Military Review applied this principle in disapproving a female sailor's conviction for unauthorized absence because of the sexual harassment to which she had been subjected. Thereafter, in the companion case involving her husband, we dismissed a similar conviction on the theory that his absence also was excused by the harassment of his wife.[2]

■ In the case at bar, appellant claimed at trial that he had been subjected to racial harassment, which extended to threats on his life. In view of established national policy, which frowns on racial discrimination,[3] we see no reason to treat such a claim

---

**2.** *United States v. Roberts,* 15 M.J. 106 (C.M.A. 1983). Although it had not set aside the findings of guilty of unauthorized absence, the Court of Military Review approved a sentence of no punishment.

**3.** Racial distinctions are considered inherently suspect, and in recent decades various statutes and judicial precedents have inveighed against racial discrimination and harassment. *See generally* Civil Rights Act of 1875, 18 Stat. 336; Civil Rights Act of 1957, Pub.L. No. 85–315, 71 Stat. 634; Civil Rights Act of 1960, Pub.L. No. 86–449, 74 Stat. 86; Civil Rights Act of 1964,

differently from life-endangering sexual harassment. Therefore, in light of *Roberts,* it is clear that the trial defense counsel was not offering a frivolous defense to the charge of unauthorized absence.

■ Moreover, the evidence that appellant was harassed and threatened—even though apparently not deemed sufficient by the judge to excuse Hullum's absence—could properly be considered in mitigation of punishment. As one text explains:

> One who commits a crime while subject to coercion, but whose situation does not come under the rules which permit justification (perhaps his crime was murder of the intent-to-kill sort; or his fear of death or serious bodily injury was not reasonable; or his fear was one of future harm), may nevertheless properly argue that his punishment, within the permissible limits of punishment for the crime in question, should be lower than it would have been if he had not been coerced.

W. LaFave and A. Scott, *Handbook on Criminal Law* 379 (1972).

In contending on appeal that Hullum's sentence was too severe, appellate defense counsel could have relied not only on the mitigating evidence of harassment but also on the evidence that Hullum was "practically a model sailor, except when people mess with him," and on the military judge's recommendation concerning suspension of a bad-conduct discharge.

In view of these circumstances, we reject the Government's contention that it would have been frivolous for appellate defense counsel to have claimed before the Court of Military Review that the sentence was inappropriately severe. Indeed, as has already been indicated, appellate defense counsel could properly and ethically have argued that, in the proper exercise of its factfinding powers, the court below should hold that several of appellant's absences were excusable.

III

To conclude that an argument would not be frivolous is not to say that appellate defense counsel were obligated to make the argument. For example, appellate advocates often are urged to present only the most convincing claims to an appellate court, rather than to employ a "shotgun" approach, whereunder they advance every plausible contention in their briefs and oral arguments. *See, e.g.,* Causey, *Some Practical Suggestions for the Appellate Lawyer,* 29 *Fed.Bar News and Journal* 462, 463 (December 1982). However, in the case at bar, the actions of appellate defense counsel cannot be explained in this way, for they did not focus on the strongest arguments in appellant's behalf. Instead, appellate defense counsel presented no claims or contentions whatsoever—even though the case was being reviewed by a court empowered to consider not only the law but also the facts and the appropriateness of sentence.

Another attempted justification of the failure of appellate defense counsel to present contentions that are not frivolous might rely on the interests of appellate defense counsel as an institution. The premise would be that if appellate defense counsel submitted briefs and presented oral argument in every case, they would overload the Courts of Military Review to such an extent that those tribunals could not give adequate attention to the truly meritorious case. According to this view, appellate defense counsel should concentrate on the "big case," even at the sacrifice of appellants in other cases.

■ Undoubtedly, there are cases of far-reaching significance to which special time and attention must be given by appellate defense counsel. However, we do not believe that, in enacting Article 70 of the Uniform Code, 10 U.S.C. § 870, Congress intended for one servicemember's appeal to

Pub.L. No. 88–352, 78 Stat. 241; Voting Rights Act of 1965, Pub.L. No. 89–110, 79 Stat. 437; *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); *Brown v. Board of Education of Topeka,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Even before some other institutions in our society, the Armed Services committed themselves to the elimination of racial discrimination.

be argued less vigorously in order to enhance the plausibility or acceptability of the arguments of appellate defense counsel in behalf of other accused. Otherwise, military justice would be aligned with practices that are generally disfavored—such as a defense lawyer's plea bargaining cases en masse or a plaintiff's attorney entering into a "package deal" with a claims adjuster to settle a number of cases, even though the interests of a particular client may be disadvantaged.[4]

■ While we require that appellate defense counsel exert every reasonable effort for each of their clients, we cannot second-guess every decision by such counsel as to the issues which should be argued on appeal. Otherwise, many appellants would be induced to petition us to review claims that in the Courts of Military Review their counsel should have presented briefs and oral arguments in a different way. However, just as the difficulties in reviewing trial tactics have not deterred us from considering ineffective assistance of counsel at trial, we need not abandon all consideration of whether appellate defense counsel have rendered the type of services contemplated by Congress in enacting Article 70.

■ Consistency requires that we measure appellate advocates by the same standard that we have invoked for trial lawyers. Thus, appellate defense counsel must act with the competence reasonably expected of an attorney rendering such legal services. Cf. *United States v. Rivas,* 3 M.J. 282 (C.M.A.1977).[5] In the present case, then, the issue is whether, in light of the contents of this record of trial, Hullum's appellate defense counsel handled his appeal with the competence reasonably expected of an appellate advocate in the military justice system.

■ In view of the unique features of this case, we must answer this issue in the negative. In the first place, the issue of the effect on appellant's findings and sentence of the threats to which he had been subjected should have been quite visible to the appellate defense counsel. It had been vigorously asserted at trial, and then, after trial, Hullum's defense counsel continued to attack the sentence by submitting in his client's behalf a petition seeking clemency. The first reason for clemency cited in that petition was that "Hullum went on unauthorized absence ... due to verbal, written and physical threats against his life." Even though the request for appellate representation submitted by appellant did not set forth any specific issue to be asserted by his appellate defense counsel, there obviously was no intent by appellant to abandon his highest complaint against the harassment to which—before, during, and after trial—he claimed he had been subjected. Cf. *United States v. Grostefon,* 12 M.J. 431 (C.M.A.1982).

Secondly, in light of the strong Service policy against harassment of military personnel—whether done for racial, sexual, or other reasons—appellate defense counsel should have recognized that this was not a routine case. Instead, it was one in which he had an especially good opportunity to get the attention of the appellate tribunal. Indeed, because of the sensitivity of the issues involved, appellate defense counsel might even have anticipated that a failure to raise in some way Hullum's complaints about the mistreatment to which he had

---

4. *See* Model Code of Professional Responsibility, Canon 5; EC 5–1 and 5–14; DR 5–105(A) and (B), and 5–106(A) (1979). *See generally Hayes v. Eagle-Picher Industries, Inc.,* 513 F.2d 892 (10th Cir.1975); *Financial General Bankshares, Inc. v. Metzger,* 523 F.Supp. 744, 769–70 (D.D.C.1981), *vacated on jurisdictional grounds,* 680 F.2d 768 (D.C.Cir.1982); *Commonwealth v. Michel,* 381 Mass. 447, 409 N.E.2d 1293, 1296–98 (Mass.1980).

5. Implicitly we have recognized this principle in the past by relieving appellants from the consequences of omissions by their counsel which might have constituted ineffective assistance. Thus, in a few of the cases where we have specified issues for review or granted relief on grounds not urged by counsel, appellate defense counsel may have failed to perform their duties as appellate advocates. The same may be said in some of the cases where we have allowed a tardy filing of pleadings by appellate defense counsel.

been subjected would provoke a suspicion that a matter potentially embarrassing to the Armed Services was being covered up.

In sum, from our consideration of the record of trial in this case, as compared with the thousands of others which we have reviewed, and from our consideration of the guidance to effective advocacy provided by recognized authorities, *see, e.g.,* Re, *Brief Writing and Oral Argument* (4th Revised Ed.1977), we are convinced that Hullum's appellate defense counsel should have presented argument based on the evidence of threats and racial harassment.

## IV

The Government, in turn, replies that the failure of appellate defense counsel to raise any issue in the Court of Military Review was not prejudicial, since the members of that court undoubtedly reviewed the record with thoroughness and reached a proper result. Carried to an extreme, this argument would suggest that it is a profligate waste of money to provide appellate defense counsel because, if left to their own devices, judges on Courts of Military Review would reach the correct result anyway. This contention—while flattering to appellate military judges, who are depicted as almost infallible—says little for the contribution skillful advocates can make to a court's consideration of an appeal.

Moreover, the Supreme Court rejected such an argument some time ago in *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). There, pursuant to a State rule of procedure, "the California District Court of Appeal ... had 'gone through' the record and had come to the conclusion that 'no good whatever could be served by appointment of counsel.' " *Id.* at 354–55, 83 S.Ct. at 815. This procedure was held constitutionally infirm, since under it "only the barren record speaks for the indigent, and, unless the printed pages show that an injustice has been committed, he is forced to go without a champion on appeal. Any real chance he may have had of showing that his appeal has hidden merit is deprived him when the court decides on an

*ex parte* examination of the record that the assistance of counsel is not required." *Id.* at 356, 83 S.Ct. at 816. In short, the Supreme Court concluded in *Douglas* that a lawyer can make a contribution in the appellate process and that with "a champion on appeal," an appellant may obtain significantly better results. Likewise, we conclude that the absence of effective assistance of counsel during an appeal from a court-martial conviction is not an inconsequential deprivation of a right.

Of course, there are cases where it is undeniable that even the most talented appellate advocate could not change the outcome of an appeal. Under those circumstances, the omissions or errors of an appellate defense counsel may be harmless. However, usually it is dangerous to speculate how an appellate court—especially when armed with factfinding and sentence-appropriateness powers—may respond to well-presented arguments. Certainly, we see no occasion to engage in such speculation in this case, since—unlike a rehearing at the trial level—a remand for further proceedings in the Court of Military Review will not require great effort or occasion substantial expense or inconvenience. Upon remand to the court below, appellate defense counsel can present arguments in support of a more favorable result for his client, and those arguments can be evaluated by that court in light of the record.

## V

The decision of the United States Navy-Marine Corps Court of Military Review is reversed, and the record of trial is returned to the Judge Advocate General of the Navy for submission to that court for further review under Article 66.

FLETCHER, Judge (concurring in the result):

The intermediate appellate court, as provided for under the Uniform Code of Military Justice, is unique among Federal intermediate courts in that Congress specifically charged that court in Article 66(c), UCMJ, 10 U.S.C. § 866(c), with the following obligation:

(c) In a case referred to it, the Court of Military Review may act only with respect to the findings and sentence as approved by the convening authority. *It may affirm only such* findings of guilty, and the *sentence or such part or amount of the sentence, as it finds correct in* law and *fact and determines, on the basis of the entire record, should be approved.* In considering the record, it may weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that the trial court saw and heard the witnesses.

(Emphasis added.)

Without using the word "clemency" or any of the standard synonyms for that power, Congress granted this authority to the Courts of Military Review.

The present case, in accord with the facts set out in my Brother's opinion, demonstrates a classic case of racial intolerance. We do not know from the record the cause of this intolerance; we are only presented with it. If history serves as any telltale sign, we can assume color alone would be a sufficient cause; hopefully, only personality differences would not give rise to the fear expressed by both the assailant and the person assailed in these facts. Accidental place of birth of either tormentor or tormented frequently gives rise to this all-too-familiar pattern, not only in the military but in general society.

The ultimate legal question before the Court is not why the confrontation existed, but whether it gave rise to a mental attitude sufficient as an affirmative defense to excuse disregard of the law. If not rising to this very high plateau,[1] then does it rise to a lesser summit that requires consideration of a lesser punishment for the violation of the law? This case reaches the lesser summit.

The military judge, realizing that the evidence in this case did not constitute a total defense, did, after argument by defense counsel, consider the evidence in the matter

of sentence and recommended suspension of the bad-conduct discharge, with conditions. The convening authority, however, suspended confinement in excess of 90 days, after considering, along with other matters, a clemency petition submitted by the trial defense counsel.

The Code, as stated above, charges, in effect, the Court of Military Review with the responsibility to assure, based upon the entire record, that an appropriate sentence be approved. I agree with government counsel that as this charge is implicit in the statute, we must assume the court considered the total record, and, noting the above-stated actions by the trial judge and the convening authority, approved the sentence.

This conclusion, however, does not answer the question presented before this Court.[2] WHETHER IN VIEW OF THE CIRCUMSTANCES OF THIS CASE AND THE BROAD POWER POSSESSED BY A COURT OF MILITARY REVIEW, THE APPELLANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL'S FAILURE TO BRIEF AND ARGUE THE ISSUE OF SENTENCE APPROPRIATENESS BEFORE U.S. NAVY–MARINE CORPS COURT OF MILITARY REVIEW.

In most cases, absence without leave is an offense that either occurred or did not; there is no in-between. One may either be present for duty or absent by leave of proper authority. The Government's burden of proof is to show that a member was not present or accounted for.

Why a person places himself or herself absent is of little moment to the issue of whether one is guilty of being absent without leave. It is of the utmost moment as to sentence; the details of the "why" should be set forth at every opportunity of review. The "why" is just as necessary to the Government as to the defendant if an appropriate sentence is to be arrived at and

---

1. Para. 216f, Manual for Courts-Martial, United States, 1969 (Revised edition).

2. *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963).

approved. He who would use the "why" to his advantage has the burden of bringing it to the attention of the trial judge and those in a position of review. This is a light burden, for the facts will generally speak for themselves and little additional argument will be needed. Where the facts speak directly to the extenuation and mitigation, it is counsel's obligation to call these facts to the attention of those with the authority to extenuate and mitigate.

Does the fact that appellate defense counsel does not call facts of extenuation and mitigation to the attention of the Court of Military Review deprive appellant of the effective assistance of counsel? In most crimes, generally known in the civilian sector of our society as misdemeanors or felonies, the answer would be no. In strictly military offenses the motivation for the commission of the offense may be of more importance to a stable military society, and to arriving at a fair sentence, than the crime itself. Such an offense is absence without leave where the facts are as in this case. Accordingly, I would answer the question in this case affirmatively.

COOK, Judge (dissenting):

This case provides a present example of the wisdom of the legal maxim: "Hard cases make bad law." I am moved by the force of the lead opinion, no doubt in the same way that the United States Navy-Marine Corps Court of Military Review would have been had the same words been presented by the appellate defense counsel. However, I must read the opinion as a judicial pronouncement, not an argument, and, as such, I cannot agree with the rule it purports to set forth.

The majority apparently extends the rule in *United States v. Rivas,* 3 M.J. 282 (C.M.A.1977), to appellate defense counsel.[1] Despite the facial appeal of such a rule, it is, in practice, difficult to apply since it substitutes the subjective reaction of a particular appellate judge to a particular issue for the action taken by the appellate defense counsel. Such a standard is impossible to manage. The ultimate decision to raise any issue thus lies in the hands of the appellate court, acting with the clear light of hindsight based upon undefined reasons as to how the issue affects it without any knowledge of the appellate defense counsel's reasoning which underlays his decision not to pursue the issue. Obviously, the result will be that appellate defense counsel must now raise every possible issue or suffer the peril of being declared incompetent by this Court. This doctrine flies in the face of "the obligation of any lawyer—whether privately retained or publicly appointed—not to clog the courts with frivolous motions or appeals." *Polk County, et al. v. Dodson,* 454 U.S. 312, 323, 102 S.Ct. 445, 452, 70 L.Ed.2d 509 (1981) (footnote omitted).

In the instant case, I can agree that, had I been the appellate defense counsel, I might well have raised certain issues on appeal.[2] However, the test is not what I might have done, but whether the decisions of the appellate defense counsel met the standards of professional competence demanded of him by the Uniform Code of Military Justice and the Standards of Professional Ethics. These involve an objective standard. I can review the record and determine whether such issues are, in my opinion, frivolous and, what is more important, whether failure to raise them violated the Code or the doctrine of due process as applied in the military justice system.

Looking at the issues identified by the majority, the issue of duress was litigated at trial and resolved adversely to the accused. The issue of sentence appropriateness was raised before the convening authority, who provided some sentence amel-

---

1. In *United States v. Rivas,* 3 M.J. 282 (C.M.A. 1977), which involved an objective standard in a subjective way, I dissented, expressing my reservations with the impact of the lead opinion. 3 M.J. at 290.

2. While emotions could easily be stirred by this case, I cannot formulate a rule to govern this type of situation that, in its general application, would not be unmanageable.

ioration in his action.[3] I cannot say that the accused has not been afforded the benefits provided by the Uniform Code of Military Justice; hence, I cannot find that appellate defense counsel was inadequate in his decision to submit the case on the merits to the Court of Military Review and here. To require more appears to me to be a substitution of a subjective reaction to this case rather than an objective review of the actions of the appellate defense counsel. If we impose this subjective standard of review, this Court, within a short time, will receive nothing but inadequacy of representation assertions and will never get to consider the substantive questions of law which we are created to resolve. I cannot accept such a standard and, therefore, dissent.

3. The accused was convicted of five episodes of absence without leave totaling almost 600 days. The military judge, sitting alone as a special court-martial, sentenced him to a bad-conduct discharge, confinement at hard labor for 4 months, and reduction to E–1. The convening authority approved the sentence adjudged, but suspended confinement in excess of 90 days for 6 months. I cannot say, as a matter of law, that the sentence was excessive.