UNITED STATES, Appellee,

v.

Kent M. STINSON, Private First
Class U.S. Army, Appellant.

No. 66,799.
CM 8903368.

U.S. Court of Military Appeals.

Argued Feb. 12, 1992.

Decided June 22, 1992.

**304**

For Appellant: *David R. Dowell* (argued); *Captain Beth G. Pacella* (on brief); *Captain Timothy M. Lawlor.*

For Appellee: *Captain Timothy W. Lucas* (argued); *Colonel Dayton M. Cramer* and *Lieutenant Colonel Daniel J. Dell'Orto* (on brief).

## Opinion of the Court

CRAWFORD, Judge:

Appellant was tried by a general court-martial composed of officer members. Contrary to his pleas, he was found guilty of felony murder and carrying a concealed weapon, in violation of Articles 118 and 134, Uniform Code of Military Justice, 10 USC §§ 918 and 934, respectively. He was sentenced to a dishonorable discharge, confinement for life, total forfeitures, and reduction to the lowest enlisted grade. The convening authority approved the sentence. The Court of Military Review affirmed the findings and sentence in an unpublished opinion dated February 28, 1991.

We granted review to determine: (1) whether the evidence at trial was insufficient as a matter of law to support the findings of guilty of felony murder and (2) whether "appellate defense counsel's waiver of oral argument" before the Court of Military Review "violated appellant's right to effective assistance of counsel." We answer both issues in the negative.

I

■ While stationed at the William O. Darby Kaserne, Fuerth, Germany, appellant met and fell in love with Lisa. Because of difficulties at home, Lisa lived in a shelter when appellant met her. Appellant later assumed the burden of providing living accommodations and providing for a portion of her support. He appeared to be willing to do anything for her and attempted to meet her expensive tastes. PFC Vincent Duval, a friend of appellant, testified that Lisa constantly needed more money. Appellant and Lisa planned to be married and Lisa had purchased wedding rings in anticipation of that event. Appellant and Lisa also planned on purchasing at least a 3–day travel package so they could be married in Denmark. This package included transportation and accommodations for 1,050 Deutsche marks. There was testimony that they wanted to purchase a 10–day package to Denmark but knew they could not afford even the 3–day package. Additionally, appellant's 1978 BMW, which had become inoperable, still required him to make monthly payments in excess of $170. Appellant was also obligated to pay $179 to a German video store for video tapes that he had lost. Further, he had borrowed money from other soldiers, sometimes on a weekly basis, and owed one soldier $100 for Lisa's living accommodations.

On July 12, 1989, appellant returned to his barracks to learn that he was tasked to clean the barracks, for a "GI party." This meant that he would not be able to spend that evening with Lisa as the couple had planned. Before the cleaning assignment commenced, he went to the Kentucky Fried Chicken where Lisa worked and informed her that he could not be with her that night because he had to return to the barracks. After he had returned to his barracks and contrary to the instructions he had given her, Lisa appeared at the front gate of the Kaserne looking for appellant. Appellant, who was buffing the barracks floor when Lisa arrived, met her and took her into his barracks. There Lisa announced that a stranger in a new red Nisson 300 ZX had offered her a job for more money and she was considering it. In fact, she had resigned her job before going to the Kaserne. Appellant was jealous because twice before Lisa had been unfaithful. They argued about the matter, and he told her not to take the job. While in the barracks, Lisa obtained a survival knife from appellant's dresser drawer and, in a joking fashion, brandished the knife before the other occupants in the room. But before leaving she returned it to the dresser drawer.

When Lisa departed for home, appellant accompanied her to the train* station. Because appellant did not have sufficient money for a taxi to return to the barracks, Lisa gave him a 20 Deutsche mark bill. Lisa testified at trial that they hugged and kissed upon parting. She further testified that their embrace was such that she would have felt a knife on appellant's body, but did not.

The taxi which returned appellant to the barracks was driven by Monika Nahr. Appellant testified that, when he returned to the Kaserne, he paid Ms. Nahr a fare of 10 marks and asked her to wait for him while he returned to the barracks. He left his hat in the taxi and went into his room. A soldier in the adjoining room heard sounds similar to dresser drawers being opened and closed. Appellant testified he went to his room hoping another soldier would dissuade him from committing suicide. This was not corroborated. After a few moments, appellant departed the room and was observed by the gate guards carrying something under his arm as he returned to the taxi. Appellant reentered the taxi and directed Ms. Nahr to drive him to an area that was relatively isolated.

After they arrived at this secluded spot, a struggle ensued. Ms. Nahr somehow managed to call her dispatcher with a cry for help. Residents in the area heard a staccato horn sound from the taxi and left their homes to investigate. Upon approaching the taxi, they noticed two individuals struggling inside. The taxi door burst open, and the accused, without his hat, escaped across an open field. He threw the knife into the field and scurried underneath a bush where he remained until the next morning. When the neighbors examined Ms. Nahr, she was dead and covered with blood. She had been stabbed eighteen times in the neck, chest, and abdomen. She also had a cut on the left side of her neck running from below her ear to her chin. Later, the police found Ms. Nahr's money purse in a secret pocket of the driver's side seat cover. The money pouch had not been disturbed. A cap was found in the taxi with appellant's name sewn inside. The police recovered appellant's survival knife from where he had thrown it in the field. Early the next morning, appellant was apprehended when he returned to the Kaserne. He had no hat and his uniform was bloody. A 10–mark bill and his May pay slip with mathematical computations were found hidden in one of his socks.

While in pretrial confinement, he wrote numerous letters acknowledging his need for money. Subsequently, appellant admitted to the police and at trial that he killed the taxi driver. He denied that he had any robbery motive. He testified that he had intended to commit suicide but could only remember having the taxi driver's hair in his hand and seeing blood on his survival knife.

Several factors strongly suggest that appellant's true motive was robbery and not suicide. First, appellant directed the taxi driver to wait for him outside his barracks, an indication of his previously formed intent to rob her. Moreover, his purpose for entering the barracks was to retrieve his survival knife with the serrated edge.

Appellant maintained that he decided to commit suicide prior to buffing the barracks floor and prior to escorting Lisa to the train station. He claimed that he had placed the knife, without its sheaf, in his right BDU (utility uniform) pants pocket prior to departing for the train station. Yet inspection of the pants pocket showed no damage to corroborate this claim. Further, Lisa's own testimony contradicted appellant's assertion. Appellant additionally claimed that, upon returning from the train station, he entered the barracks to speak to a friend who might dissuade him from committing suicide. This claim is implausible, considering the fact that he directed the taxi driver to wait for him and left his BDU hat in the taxi. Moreover, appellant's behavior prior to the crime was not viewed as

---

* The opinion below says "bus station." Unpub. op. at 2. However, the record shows he went with her to the nearest bus stop, and they took the bus to the train station, where they took a train to Nuernberg. (R.352.) She then took a street car to her residence.

unusual by anyone who had seen him that night or on the prior few days. No evidence from the crime scene or appellant's room suggested an intent to commit suicide. Clearly appellant's search for money was disrupted by Ms. Nahr's actions of calling her dispatcher for help and blowing the taxi horn which alerted nearby residents. Based on the evidence, the court members could very well reject appellant's lapse of memory as to the events along with his suicide theory.

## II

■ The right to effective assistance of counsel extends to all phases of the court-martial, including appellate proceedings. *United States v. Scott*, 24 MJ 186 (CMA 1987); *United States v. Hullum*, 15 MJ 261 (CMA 1983); *United States v. Jefferson*, 13 MJ 1 (CMA 1982). When assessing claims of ineffective assistance of counsel, a two-prong test must be applied. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "The first prong is competency: was counsel's assistance reasonable considering all the circumstances? The second prong is prejudice: if counsel's assistance was not reasonable, was the accused prejudiced by the deficiency?" F. Gilligan and F. Lederer, *Court–Martial Procedure* § 5–55.10 at 198 (1991). In order for appellant to succeed, he must establish both incompetency and prejudice. *Strickland v. Washington*, 466 U.S. at 687, 104 S.Ct. at 2064. There is "a strong presumption" of adequate representation, and appellant has the burden of proving that he was not effectively represented. *Id.* at 689, 104 S.Ct. at 2065. Appellant must establish "that counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688, 104 S.Ct. at 2064. Even if appellant satisfies this prong, he must still demonstrate that his counsel's deficiencies prejudiced his defense. *Id.* at 693, 104 S.Ct. at 2067. This means that counsel must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings. *Id.* at 694, 104 S.Ct. at 2068.

Appellant's claim in this case is premised solely on counsel's failure to request oral argument. This claim assumes that, if his counsel had requested oral argument, that request would have been granted and the outcome of his appellate review would have been different.

■ Oral argument before the Courts of Military Review is not a matter of right but discretionary. *See* Rule 16, Courts of Military Review Rules of Practice and Procedure, 22 MJ CXXXIII (1985). In *United States v. Rodriguez–Amy*, 19 MJ 177 (CMA 1985), this Court held that making oral argument discretionary with the Courts of Military Review does not violate a fundamental right of an appellant. Thus counsel's failure to request argument was neither determinative of whether there would be oral argument nor prejudicial to appellant's representation on appeal so as to constitute ineffectiveness. Appellate judges have disagreed as to the importance of oral argument. Justice Brennan observed that

> oral argument is the absolutely indispensable ingredient of appellate advocacy....
>
> [O]ften my whole notion of what a case is about crystallizes at oral argument. This happens even though I read the briefs before oral argument;
>
> ... Often my idea of how a case shapes up is changed by oral argument.... Oral argument with us is a Socratic dialogue between Justices and counsel.

Harvard Law School Occasional Pamphlet Number Nine 22–3 (1967), quoted in *United States v. Willis*, 13 MJ 93, 95 (CMA 1982) (Everett, C. J., dissenting).

And on another occasion Justice Brennan plainly noted:

> I have had too many occasions when my judgment of a decision has turned on what happened in oral argument, not to be terribly concerned for myself were I to be denied oral argument.

Remarks at the Third Circuit Judicial Conference in 1972, quoted in *Report of the Commission on Revision of the Federal Court Appellate System, Structure and Internal Procedures: Recommendations for Change* (June 1975), 67 F.R.D. 195, 254 (1975), quoted in *United States v. Willis, supra* at 95 (Everett, C. J., dissenting).

Others have opined that the importance of briefs cannot be overstated. They have a longer shelf life. "Few judges can remember the details of an oral presentation days, weeks, or even months later, but briefs are available until the case is finally disposed of." R. Stern, *Appellate Practice in the United States* 227 (2d ed.1989) (footnote omitted). Candidly "judges say that they thought oral argument made a difference in only a small percentage of the cases which come before them." *Id.* at 365. There is only a short period of time for oral argument which must be shared with questions from the judges. Briefs are more important for setting forth the arguments "in an orderly and comprehensive fashion." There is just not enough time for "lay[ing] out ... arguments ... with the supporting authorities." *Id.* at 227. Upon receipt of the briefs, even if argument is not requested by the parties, the judges may still order argument if they feel it is necessary.

> In the United States, doubts as to the need for two types of argument, written and oral, have often—and more and more, as the appellate caseloads become heavier—led judges to eliminate the oral arguments, at least for uncomplicated or insubstantial or frivolous appeals. Such cases, and they may comprise a substantial portion or even a majority of the appeals, are likely to be disposed of the same way whichever method of presentation comes first.

*Id.* at 228.

■ Balanced against the reasons for oral argument before an appellate court are tactical decisions for not arguing. It may be that appellate counsel thought the Government had not set forth all the evidence it could muster before the Court of

Military Review. By seeking argument the defense would allow the Government to bring out in oral arguments issues that had in fact not been mentioned in the briefs. This is a tactical decision by counsel that we will not second guess. Moreover, trial defense counsel's 17-page argument on findings was outstanding, and there was little appellate counsel could *orally* argue that was not in the brief before the court below.

As the Court of Appeals of Washington stated, waiver of oral argument might be "sufficient" basis to question counsel's "commitment" to his client's defense. However, prior counsel's filing a brief with the court "adequately raised ... the issues central to [his client's] defense." Thus, the court found no ineffective assistance of counsel. *State v. Jones*, 26 Wash.App. 1, 612 P.2d 404, 409 n. 3 (1980).

Even if appellant in the instant case satisfied the incompetence prong, we hold that there was no prejudice resulting therefrom.

The decision of the United States Army Court of Military Review is affirmed.

Judge COX concurs.

WISS, Judge (concurring):

As the majority indicates, appellant's burden in asserting ineffective representation of counsel is to "establish both incompetence and prejudice." *United States v. Scott*, 24 MJ 186, 188 (CMA 1987); *accord United States v. Harris*, 34 MJ 297 (CMA 1992). As the Supreme Court articulated the standard in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to

deprive the defendant of a fair trial, a trial whose result is reliable.

Though phrased in terms of trial representation, "[c]onsistency requires that we measure appellate advocates by the same standard that we have invoked for trial lawyers." *United States v. Hullum*, 15 MJ 261, 267 (CMA 1983). Thus, our inquiry here is: First, whether appellate defense counsel's waiver of oral argument of his assigned and briefed issue of legal and factual insufficiency of the evidence before the Court of Military Review was "unreasonable under prevailing professional norms," *see United States v. Scott, supra* at 188; and, second, if so, "whether there is a reasonable probability that, absent the" waiver, the Court of Military Review would have concluded that the evidence was legally or factually insufficient to sustain the conviction, *see id.* at 189, quoting *Strickland v. Washington, supra* 466 U.S. at 695, 104 S.Ct. at 2068.

My dissenting colleagues rely upon *Hullum* for their conclusion that appellant has carried his burden. There, the accused had defended against charged unauthorized absences by contending that he had felt that his life would be in danger if he had stayed. This Court's opinion makes clear that defense evidence in support of that contention was significant. After he had been convicted, nonetheless, the military judge had imposed a sentence, *inter alia*, to a bad-conduct discharge and confinement for 4 months, but the military judge had conditionally recommended suspension of the punitive discharge. Although he suspended the confinement in excess of 90 days, the convening authority did not suspend the discharge.

In this context, appellate defense counsel before the Court of Military Review in *Hullum* requested and received "four enlargements of time because of 'extremely heavy caseload of counsel.' Finally, appellate defense counsel submitted the case to the court below 'without specific assignment of errors' and with a 'waiver of oral argument.'" 15 MJ at 262. Counsel urged neither the circumstances revealed at trial,

the military judge's recommendation, nor the accused's good service record as a basis for asking the Court of Military Review to reduce his client's sentence.

Under "the unique features of" that case, *id.* at 267, the majority of this Court explained in some detail why it concluded that appellate defense counsel's representation was both deficient and prejudicial. Tellingly, the Court pointedly observed that "appellate defense counsel presented no claims or contentions whatsoever—even though the case was being reviewed by a court empowered to consider not only the law but also the facts and the appropriateness of sentence." *Id.* at 266.

The instant case, of course, is an animal of a far different color. First, appellate defense counsel here *did* challenge both the legal and the factual sufficiency of the evidence in the Court of Military Review and argued both in his brief in a manner that is not charged here as deficient. Thus, appellant's basis for his claim of deficient representation—in marked contrast to *Hullum*—did not extend to counsel's failure to urge his cause *at all* before the appellate court but, instead, was limited to counsel's declination to *orally* argue these same issues. Yet, having affirmatively asserted his client's cause in writing, there might be any number of reasons why counsel might decide to forgo oral argument, as the majority opinion notes. 34 MJ at 306. Indeed, in light of the solid strength of the prosecution's case, oral argument here might well have served only as an opportunity to vividly showcase the uphill nature of his claim of evidentiary insufficiency of guilt.

Second, any prejudice to appellant from counsel's not orally arguing the issues that he had raised and briefed in writing is belied by the summary of evidence in the majority opinion, which capably demonstrates the lack of any foundation for concluding "that there is a reasonable probability that, absent the" waiver of oral argument, the Court of Military Review would have found the evidence either legally or factually insufficient to uphold appellant's

conviction. *See Strickland v. Washington* and *United States v. Scott,* both *supra.*

I share the concern that appellate defense counsel be ever sensitive to their legal and professional responsibility to aggressively pursue their client's cause in the Court of Military Review and in this Court. That does not suggest, however, that where counsel does so in a fully capable manner in his written brief, his waiver of a request to orally argue his position *necessarily* is either deficient or prejudicial, much less both. Under the circumstances of this case, I believe that is what the dissenters incorrectly imply.

SULLIVAN, Chief Judge, joined by GIERKE, Judge (dissenting):

At the trial level (*see United States v. McGillis,* 27 MJ 462 (CMA 1988)) and the post-trial level (*see United States v. Polk,* 32 MJ 150, 153 (CMA 1991)), this Court has not hesitated to secure affidavits from counsel when ineffective-representation claims are made. *See United States v. Harris,* 34 MJ 297 (CMA 1992). I see no reason why the same approach is not utilized where an ineffective-assistance-of-counsel claim is raised concerning counsel's performance at the Court of Military Review.

Appellant is facing an approved sentence of life imprisonment. The evidence of his guilt of felony murder was circumstantial and perhaps conflicting in certain critical respects. In view of the Court of Military Review's unique powers which permit the reconsideration of factual questions *de novo* as well as redetermination of an appropriate sentence, Art. 66(c), Uniform Code of Military Justice, 10 USC § 866(c), counsel's waiver of oral argument in these circumstances is incomprehensible and prejudicial. *See generally United States v. Hullum,* 15 MJ 261 (CMA 1983).

Here, the Court of Military Review, using its important Article 66 power, found the following nine key facts to support appellant's conviction for felony murder:

a. appellant was under financial strain caused by debts, the cost of taking care of Lisa, Lisa's expensive tastes, and their impending marriage;

b. appellant was jealous and upset at the stranger's offer of a job to Lisa and Lisa's consideration of it because of her perceived need for more money;

c. at some point, appellant determined to rob the female taxi driver, who was apparently an easy robbery victim;

d. appellant caused the taxi driver to return him to his barracks and wait for him while he obtained his survival knife to assist in the robbery;

e. appellant had the taxi driver go to a relatively isolated area;

f. when the taxi stopped, in order to obtain money, appellant placed the knife at the neck of the taxi driver;

g. unexpectedly, the female taxi driver resisted, her neck was cut and during the ensuing altercation[,] appellant stabbed her 18 times resulting in her death; and

h. appellant could not find the hidden taxi driver purse and was scared away by the two individuals investigating the reason for the horn blowing.

We further find unpersuasive appellant's statements that he went back to the room to discuss his friend's problems, that he was going to commit suicide, and that he never intended to rob the taxi driver.

Considering these facts, we find beyond a reasonable doubt that appellant killed the taxi driver while attempting a robbery. *See United States v. Turner,* 25 MJ 324 (CMA 1987).

In view of these circumstances, explanation for waiver of oral argument, not speculation, is required. *See United States v. Tyler,* 34 MJ 293 (CMA 1992).