UNITED STATES, Appellee,

v.

Noble HARRIS, Staff Sergeant,
U.S. Army, Appellant.

No. 66,565.
CM 8801579.

U.S. Court of Military Appeals.

Argued Feb. 13, 1992.

Decided June 22, 1992.

For Appellant: *William J. Holmes* (argued); *Captain Jay S. Eiche* (on brief).

For Appellee: *Captain Samuel J. Smith, Jr.* (argued); *Colonel Dayton M. Cramer, Lieutenant Colonel Daniel J. Dell'Orto, Major Kenneth T. Grant* (on brief).

*Opinion of the Court*

WISS, Judge:

A general court-martial of officer and enlisted members tried appellant on two specifications that alleged distribution of cocaine on December 21, 1987, and January 8, 1988. In a contested trial, the court acquitted him of the first offense but convicted him of the second; and the court sentenced him to a dishonorable discharge, confinement for 8 years, total forfeitures, and reduction to the lowest enlisted grade. After the convening authority had approved these results, the Court of Military Review ordered a new convening authority's action. 30 M.J. 580 (1990). A different convening authority approved the sentence adjudged, and the Court of Military Review affirmed without opinion.

This Court granted review to consider appellant's claim that, in several different respects at trial, he was denied effective assistance of counsel by his civilian counsel. As to one aspect, we agree, so further review is necessary.

I

On the evening of December 21, 1987, PFC Curcio—"a registered source on a drug-suppression team ... at Fort Ben-

ning"—went to the barracks room of Sergeant Johnson. Curcio had targeted Johnson as a possible cocaine distributor. He had approached Johnson about purchasing some cocaine, and Johnson had told him to come to his barracks room later that evening. Curcio did so; and, once there, a man whom Johnson referred to as "Coop" joined them. Curcio purchased from Johnson and Coop a plastic bag of cocaine. Subsequently, Curcio turned the drugs over to his coordinator, Military Police Investigator Watson.

A second buy was set up for January 8, 1988. This time, Curcio and Watson both went to Johnson's barracks room, and Coop joined them. Curcio testified that the person whom he came to know as "Coop" on December 21 was "the same person" called "Coop" who was a part of the January 8 transaction. Once Coop joined the group in Johnson's room, he and Watson negotiated a price of $500.00 for the 12 packets of cocaine that Coop had brought with him; the exchange of· drugs and money occurred; and Curcio and Watson left. Apparently, each transaction took from 10 to 15 minutes.

Coop's true identity was not known to either Curcio or Watson. After the December 21 purchase, Curcio described "Coop" to Watson simply as a black male, without any estimation of height or weight or any identification of any specific physical characteristics like facial hair or haircut style. At the Article 32[1] hearing, he described "Coop" as "a tall, slender black male." Prior to trial, Watson had described "Coop" as not having a flattop haircut.[2] Although Watson "asked around" in an effort to identify "Coop," he was "never able to put a formal name on Coop."

For some reason—and the record of trial is silent as to why—appellant was apprehended on February 1, 1988, and was tried on the theory that he was "Coop."

Both Curcio and Watson identified appellant at trial as the man they had met as "Coop" on January 8, and Curcio testified that appellant also was the man called "Coop" from whom he had purchased cocaine on December 21. None of the $500.00 in marked money used in the January 8 transaction, however, ever was recovered, and no cocaine ever was found in appellant's possession.

Appellant's defense was straightforward: They've got the wrong man. Appellant's team of defense attorneys—led by a civilian lawyer—hammered at what appeared to be the weaknesses of the prosecution's case and, as well, presented alibi evidence that appellant was in Atlanta, over 100 miles away from Fort Benning, at the time of the December 21 transaction. Other than appellant's denial, however, the defense offered virtually no constructive defense to the January charge. Instead, the defense as to that charge rested mainly on attacking the Government's case and on turning the Government's sword on itself: If the same man was "Coop" on both occasions and if appellant was in Atlanta on the first, he was not "Coop" on the second, either.

Ultimately, as noted earlier, the members acquitted appellant of the December 21 specification but convicted him of the distribution on January 8, even though the prosecution's theory throughout trial was that the same man had distributed cocaine on both occasions.

## II

■ To carry his burden of demonstrating that his trial defense counsel failed to provide him with effective representation, appellant "must establish both incompetence and prejudice." *United States v. Scott*, 24 MJ 186, 188 (CMA 1987). In *Strickland v. Washington*, 466 U.S. 668,

---

1. Uniform Code of Military Justice, 10 USC § 832.

2. Curcio measured 5 feet 10 inches tall and testified that anyone "shorter than" he would not be "tall" in his opinion; appellant is 5 feet 9 inches tall. Additionally, appellant's hair was cut in "a flattop" style in court; and he testified, without contradiction by any prosecution evidence, that he has worn his hair cut in a flat-top since 1985.

687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), the Supreme Court specifically described this burden as follows:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

As to the deficient-performance prong, it must be remembered that

competence of counsel is presumed. To make out a claim of ineffective assistance of counsel, the accused must rebut this presumption by pointing out specific errors made by his defense counsel which were unreasonable under prevailing professional norms. *United States v. Cronic,* 466 U.S. 648 [104 S.Ct. 2039, 80 L.Ed.2d 657] (1984). The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances. "In making [the competence] determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." [*Strickland v. Washington,*] 466 U.S. at 690, 104 S.Ct. at 2066.

*United States v. Scott, supra* at 188. As to the prejudice prong,

[t]he test ... "is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland v. Washington, supra* [466 U.S.] at 695 [104 S.Ct. at 2068].

24 MJ at 189.

With this refresher as to the applicable legal principles in mind, we turn now to appellant's claim of inadequate performance by his trial attorneys. In light of our conclusion as to part of the first of the four legs of his claim, however, we need not now consider the remaining three. That first contention is that his trial defense counsel "fail[ed] to present relevant and material evidence of appellant's innocence." Final Brief at 6. In this regard, he points to two omissions.

*Medical Records*

The first claimed delict is summarized by the following passage from appellant's brief in this Court:

The two government witnesses, Curcio and Watson, described two drug transactions which occurred in Room 219 of Barracks # 2837 by a man known only as "Coop" who walked into the room after them and who departed before they did. This testimony is extremely significant and crucial because at the very time of the alleged offenses, appellant was on *crutches* and *could not walk,* especially up stairs. Appellant's military medical records, previously admitted by the Army Court of Military Review as Defense Appellate Exhibit D, unequivocally reflect that in the middle of December 1987, appellant was hospitalized and confined to a wheel chair as a result of stab wounds which deeply lacerated his right thigh and left calf muscles. After several days in the hospital, appellant was placed on convalescent leave where he was *ambulatory only with crutches* and was confined to *flat surfaces only.* Defense Appellate Exhibit D at 1 of 5. Thus, at the very time when "Coop" had freely walked up the stairs and in and out of Room 219 to sell cocaine, appellant was convalescing from a serious injury, was ambulatory only with crutches, and could not climb stairs or other inclines.

Final Brief at 7.

█ Before evaluating the importance of the medical records in question that purport to support the claim of counsel ineffectiveness, we pause to correct a number of outright inaccurate statements and mis-

leading implications in the quoted passage.[3]

First, to whatever extent it may be relevant, the record does not support the assertion that Coop departed the room on either occasion before Curcio, or before Curcio and Watson, had departed. In fact, all the testimony is that Curcio, on December 21, and Curcio and Watson, on January 8, left when the transactions were complete and while Coop still was in the room.

Second, there is no evidence that Coop, prior to entering the room, "had freely walked up the stairs." Indeed, there is no evidence that he ascended the stairs at all prior to the transactions (he might have been there all along), much less any evidence as to the manner in which Coop had climbed the stairs.

Third, counsel argues that "in the middle of December ..., appellant was hospitalized and confined to a wheel chair" and that, "[a]fter several days in the hospital, appellant was placed on convalescent leave where he was ambulatory only with crutches...." Instead, Defense Appellate Exhibit D, page 1 of 5—cited by counsel in support of these affirmative assertions of fact—reflects only that, on December 11, appellant arrived at the physical therapy clinic in a wheelchair and was taught the four-point gait on crutches. Additionally, on that date, the records show that appellant was ambulatory for 100 feet on flat surfaces. Accordingly, whether appellant was at some point "hospitalized and confined to a wheel chair" (and we are unaware of the source of counsel's claims in this regard), appellant was able to walk with both feet on the ground with the aid of crutches as of December 11, 1987.

Fourth, the same medical records reflect that, on December 28—only 1 week after the first charged transaction, of which appellant was acquitted, and 11 days before the second one, here in issue—appellant still had "pain and tightness in [left] calf," "can't run," and had "minimal numbness"

on the side of his left foot. These records also reflect, however, that, as of that date, appellant could "[w]alk at [his] own pace & distance for exercise," Def.App. Ex. D at 2 of 5; as well as was medically cleared to wear a 40–pound backpack and for nearly all forms of physical exercise and maneuvering except "side-straddle hop," "jogging in place," "calf stretch," "hams. & calf stretch," and "turn and bounce." Def.App. Ex. D at 4 of 5.

Thus, with the facts properly focused, it is not difficult to discern why trial defense counsel saw little to be gained from introduction of these medical records. There is, in short, nothing in them that "affirmatively demonstrated that it was virtually *physically impossible* for appellant to have committed the charged offenses," as civilian appellate defense counsel has blithely asserted. Final Brief at 9. We hold that, under *Strickland v. Washington, supra,* counsel's performance in this regard was neither deficient nor prejudicial.

### Evidence of Military and Personal Character

■ Appellate defense counsel successfully offered as appellate exhibits in the Court of Military Review 19 letters from appellant's colleagues and superiors favorably attesting to his military and personal character, 31 awards and certificates of achievement, and 11 performance evaluations. He urges in this Court that, had trial defense counsel obtained and introduced this impressive body of highly favorable and readily available evidence, the result of the trial might well have been different. *See* Mil.R.Evid. 404(a)(1), Manual for Courts–Martial, United States, 1984; *United States v. Weeks,* 20 MJ 22 (CMA 1985); *United States v. Kahakauwila,* 19 MJ 60 (CMA 1984).

These appellate exhibits are, indeed, impressive. They reflect a noncommissioned officer (NCO) of the very highest order.

---

**3.** Unfortunately, appellant's brief contains other such inaccuracies or distortions. There is a *fine* line—but a *distinct* line—between forceful advocacy of the meaning of evidence, on the one hand, and misstating or inaccurately implying the state of the evidence, on the other. The former is acceptable conduct; the latter is not.

Words and phrases like "outstanding," "role model," "beyond reproach," "highly professional," and "highest caliber" are commonplace in the character letters. One letter, written by a sergeant first class, stated, "I can say that he is truly a remarkable professional soldier who displays good conduct and judgement at all times." This estimation is fully typical of letters from such authors as a command sergeant major, first sergeants, sergeants first class, a staff sergeant, first lieutenants, captains, and teachers. They contain, as well, several expressions of shock at the charges levied against appellant and of belief that appellant is not the sort of person or NCO who would engage in drug trafficking.

The Enlisted Evaluation Reports are singularly outstanding. The most recent evaluation for the period ending in February 1988 awarded appellant perfect "5s" in all categories of professional competence and professional standards. Additionally, a lengthy and thoughtful narrative evaluation of appellant began: "SSG Harris' performance as a Squad Leader has been no less than superb. He is an outstanding Noncommissioned Officer who is consistently demonstrating personal initiative, superior knowledge and willingness to accomplish the mission. His technical and tactical knowledge, coupled with his ability to lead by example is a standard for his peers to emulate." Def.App. Ex. C at 1 of 10.

We acknowledge that civilian defense counsel did offer the testimony of appellant's command sergeant major that appellant "is a good soldier." When defense counsel asked this witness whether he had "an opinion ... as to whether or not [appellant] would have the character of selling drugs," however, he responded:

> That's kind of hard to say. I could not really say if I could make a determination as to whether he would sell drugs or not.

No other character evidence was offered prior to deliberations on findings, although presumably the members could see appellant's medals displayed on his uniform in court.

In a case such as this, where the identity of the perpetrator is the sole issue in the case, it is reasonable to ask why a defense counsel would not avail himself of evidence of such remarkable quantity and quality that would tend to show that a person of such outstanding personal and military character would not engage in conduct such as that charged. *See United States v. Court*, 24 MJ 11 (CMA 1987); *United States v. Hurtt*, 22 MJ 134 (CMA 1986); *United States v. Vandelinder*, 20 MJ 41 (CMA 1985). Though counsel ably and successfully presented an alibi defense for the December 21 transaction, the prosecution of which was supported almost entirely by the testimony of the registered source Curcio, little affirmative defense evidence was offered concerning the January 8 transaction of which appellant was convicted except appellant's own sworn denial.

Even accounting for the presumption of competence and even keeping in mind that the reasonableness of counsel's performance is to be evaluated from his perspective at the time of trial, appellant's assertion in this Court—that trial defense counsel's failure to obtain and introduce the evidence described above effectively undermined the adversarial process regarding the January 8 transaction—raises a substantial question of effectiveness of counsel. *See generally United States v. Rivas*, 3 MJ 282, 289 (CMA 1977) (counsel's performance deficient where he "remain[ed] silent" at a critical point where there was "no realistic strategic or tactical decision to make but to speak up").

We are likewise concerned that omission of the evidence might have prejudiced appellant's defense. The prosecution's theory was that appellant was the one-and-the-same "Coop" who distributed drugs both on December 21 and on January 8. In the face of the testimony of Curcio that appellant was the "Coop" who sold him cocaine on December 21 and Curcio's testimony that the same "Coop" was the seller on January 8, the members apparently were persuaded by appellant's alibi evidence that he was in Atlanta, Georgia, when the first

offense was committed, and so they acquitted him of that specification.

Appellant offered no similar alibi for January 8. However, he points to the members' rejection of Curcio's positive identification and credibility as to the earlier transaction; the fact that Watson apparently had never seen appellant or identified him as the January 8 "Coop" between that date and the date of trial some 8 months later; as well as various discrepancies between the physical description given of "Coop" and appellant's appearance. On this basis, he rationally argues that "there is a reasonable probability that, absent the errors [and in light of the less-than-overwhelming prosecution case], the factfinder would have had a reasonable doubt respecting guilt" of the January 8 event. *See United States v. Scott, supra* at 189, quoting *Strickland v. Washington, supra* 466 U.S. at 695, 104 S.Ct. at 2068.

### III

Although appellant raised the issue of the effectiveness of counsel's representation in the Court of Military Review, this particular theory was not urged there. For some reason, the Government has not offered this Court any affidavit of trial defense counsel that might explain this newly claimed delict, as it did in response to appellant's contentions below. Reluctant to overturn a finding of guilt and to conclude that a defense attorney's representation was deficient under these circumstances, we conclude that it is appropriate to return this case to the Court of Military Review for reconsideration in light of this opinion, after an opportunity is offered trial defense counsel to respond to appellant's claim.

The decision of the United States Army Court of Military Review is set aside. The record of trial is returned to the Judge Advocate General of the Army for remand to that court for further consideration.

Judges COX and GIERKE concur.

SULLIVAN, Chief Judge, joined by CRAWFORD, Judge (dissenting).

Our case law recognizes that military character evidence may be introduced by the defense on the merits, not that it must be introduced by the defense at courts-martial. Mil.R.Evid. 404(a), Manual for Courts–Martial, United States, 1984. *See generally United States v. Kahakauwila,* 19 MJ 60, 62 (CMA 1984). Moreover, the defense in this case called Command Sergeant Major Soloman, who testified on the merits that appellant was "a good soldier." Finally, the defense's focus in this case was on its alibi defense, not on the notion that if appellant was there, he was too good a soldier to commit the charged offense. While these defenses might not be inconsistent, I would find no incompetence of counsel in failing to introduce additional character evidence. *See United States v. Cordes,* 33 MJ 462 (CMA 1991). *Cf. United States v. Stinson,* 34 MJ 303, 309 (CMA 1992) (Sullivan, C.J., dissenting).