**UNITED STATES, Appellee,**

v.

**Anderson WALLACE, Jr., Staff Sergeant
U.S. Army, Appellant.**

No. 66,488.
CM 8903187.

U.S. Court of Military Appeals.

Argued Feb. 11, 1992.

Decided July 30, 1992.

For Appellant: *John Rakowsky* (argued); *Captain Mark L. Toole* (on brief).

For Appellee: *Captain Robert J. Walters* (argued); *Colonel Dayton M. Cramer* and *Major Joseph C. Swetnam* (on brief).

*Opinion of the Court*

WISS, Judge:

Despite appellant's not-guilty pleas, a general court-martial consisting of a military judge alone convicted him of three specifications alleging multiple instances of wrongful distribution of cocaine, *see* Art. 112a, Uniform Code of Military Justice, 10 USC § 912a. The judge sentenced him to a bad-conduct discharge, confinement for 12 years, and reduction to the lowest enlisted grade. The convening authority approved these results, and the Court of Military Review affirmed in an unpublished opinion.

On appellant's petition, this Court granted review of the following three issues:

**I**

WHETHER THE MILITARY JUDGE ERRED IN FAILING TO SUPPRESS SLIPS OF PAPER SEIZED FROM APPELLANT DURING THE WARRANTLESS SEARCH OF HIS WALLET, AND THE DERIVATIVE EVIDENCE THEREOF.

**II**

WHETHER APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHERE DETAILED DEFENSE COUNSEL FAILED TO OBJECT TO THE INTRODUCTION OF EVIDENCE OF UNCHARGED. MISCONDUCT (ALLEGATIONS THAT APPELLANT HAD DISTRIBUTED DRUGS ON OTHER OCCASIONS) DURING THE GOVERNMENT CASE-IN-CHIEF.

**III**

WHETHER THE PRETRIAL GRANT OF TRANSACTIONAL IMMUNITY TO KEY GOVERNMENT WITNESSES DISQUALIFIED THE CONVENING AUTHORITY FROM POST-TRIAL ACTION ON APPELLANT'S CASE.

Now, after full consideration of the record, we affirm.

**I**

**A**

The Army Criminal Investigation Command (CID) received an anonymous tip that Specialist Robin Farrar was distributing cocaine from her quarters. In response, the CID instructed Sergeant Sermons, who was a CID confidential source, to make friends with Farrar and to attempt to purchase cocaine from her.

At some point, a meeting between Sermons and Farrar for this purpose was arranged for March 10, 1989, and the CID made all necessary preparations for a controlled buy on that occasion. When Sermons arrived at Farrar's quarters, she advised him that she did not have the cocaine at the moment but that her source would arrive with it soon.

Shortly thereafter, surveilling agents saw a black man and woman drive up to Farrar's quarters in a car that agents learned was registered to appellant. The couple left the car and went into Farrar's quarters.

Inside, Sermons remained alone while the couple and Farrar went to the rear of the quarters. After a short period of time, Farrar returned to Sermons with two bags of cocaine, which Sermons bought. Sermons, however, did not see either of the couple in possession of the cocaine or see either one deliver it to Farrar.

Farrar was apprehended on April 26. During her interrogation, she gave two statements involving appellant in her drug operation and identifying him as the black male whom Sermons had seen on March 10. Apparently, some subsequent efforts were made to set up transactions in which appellant actually would deliver the drug to the agent/buyer, but none was successful.

In any event, the CID finally decided to apprehend appellant, and on June 9, 1989, Agent Cobb sent for him. Command Sergeant Major Boseman escorted appellant to the CID office. The following direct examination of Agent Cobb reveals what happened upon appellant's arrival:

Q. Why did you—why were you having him brought over by the unit, what was the purpose in that?

A. To be formally apprehended.

Q. What happened once the accused got to CID?

A. He arrived in the waiting room, I was told by my clerk that he was here, I went downstairs—

Q. How long do you think he was in the waiting room?

A. 3, 4, no more than 5 minutes, 5 minutes at the most.

Q. Alright [sic], what happened after that?

A. I asked him if he was Staf—Staff Sergeant Wallace, he said that he was, I showed him my identification, I told him he was under apprehension for offenses of wrongful possession, distribution of cocaine, and conspiracy.

Q. Is there any doubt in your mind if you told him he was under apprehension for those offenses?

A. I told him he was under apprehension and I also asked him if he understood what those offenses meant, or if he understood what those offenses were and he nodded in the affirmative. He didn't say anything; he nodded in the affirmative.

Q. Was the accused free to leave your office at that point?

A. No.

Q. Did he seem surprised about what you were saying to him?

A. No, he did not.

Q. What happened next?

A. Uh, I told Staff Sergeant Wallace to empty his pockets, which he did. I told him to stand against the wall and I conducted a pat down search of his body.

Q. Then what did you do?

A. I sat him down, completed a interview worksheet on him, advised him of his rights for the offenses of wrongful possession, distribution of cocaine.

Q. Let's back up a little bit; did you search his wallet at all?

A. Yes, I did.

Q. When?

A. After he had been patted down.

Q. And what did you say to him?

A. I told Sergeant Wallace, I said "watch me as I go through your wallet," we do that sometimes—a lot of times there's currency in there and we don't want any problems or someone to say my money was missing after CID searched my wallet. He was on one side of the table; I was on the other.

Q. Why were you searching the wallet?

A. Any weapons, any destructible evidence that he might have had in the wallet at the time.

A. How long between the time you searched his wallet, how long was it from the time you told him he was apprehended to the time you searched his wallet.

A. 30 seconds, 45 seconds at the most.

Q. I show you what have been marked as Prosecution Exhibit[s] 1 through 4 for identification [hands documents to witness]; can you tell me what those are?

A. [Examines.] These are photostatic copies of pieces of paper that I removed from Staff Sergeant Wallace's wallet on the day that he was apprehended in my office [returns documents to counsel].

Q. Why did you seize these pieces of paper?

A. We had reason to believe that Sergeant Wallace was a distributor of cocaine, and from the dollar amounts and the names on it, it appeared to be a list of money that was owed for cocaine transaction or drug deals.

Q. What—what was the 1—can you describe to the judge what the list is?

A. ... It would have like for example, Johnny $100.00, Mary Smith $75.00. Some of the papers contained phone numbers and dollar amounts also.

Q. What—do you know approximately how many names were on these lists?

A. Approximately 23, 24, 25 names.

Q. And approximately what the dollar value was beside these various names?

A. Approximately $2,300.00.

Q. What did you do with these pieces of paper?

A. The originals or the photostatic copies?

Q. The originals?

A. After they were xeroxed they were returned to Staff Sergeant Wallace.

\* \* \* \* \* \*

Q. What happened after that?

A. I advised Sergeant Wallace of his constitutional rights, he—he elected not to waive his rights at that time. He was fingerprinted; attempt to make—attempt to photograph him was made, the camera was inoperable. At that time he was taken to the Military Police Station for subsequent release to his unit.

Q. How was he released to the MPs; was it on a actual form, a release form?

A. I took him to the Military Police and directed that they release him to the unit on a DD Form 629 or DA Form 629.

Q. Your purpose in having the accused come to your office on the 9th of June 1989 was to apprehend him?

A. The only reason was to apprehend him, that's correct.

Subsequently, CID agents attempted to contact the people whose names were on the list copies; two of them agreed to cooperate in the investigation and implicated appellant in drug distributions. Their trial testimony, as well as the list copies, were admitted against appellant over his objection.

B

The Court of Military Review held that the challenged search of appellant's wallet was incident to his apprehension and that the apprehension was supported by probable cause. We agree.

Quoting *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949), which in turn had quoted *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925), this Court stated in *United States v. Schneider*, 14 MJ 189, 194 (CMA 1982), that ·robable cause for apprehension exists where "the facts and circumstances within ... [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed. *See also* Art. 7(b), UCMJ, 10 USC § 807(b) (authorized person may apprehend "upon reasonable belief that an offense has been committed and that the person apprehended committed it"); RCM 302(c), Manual for Courts–Martial, United States, 1984 ("Probable cause to apprehend exists when there are reasonable grounds to believe that an offense has been or is being committed and the person to be apprehended committed or is committing it.").

Measured against this standard, we conclude that the Government is correct when it argues that "[i]t cannot be seriously contended that SA Cobb lacked probable cause to apprehend the accused." Answer to Final Brief at 7. When Sermons entered Farrar's quarters to purchase cocaine, Farrar told him she had none but that her supplier would be there shortly. A few minutes later, a man driving a car registered to appellant arrived and accompanied Farrar to a back room. Shortly, Farrar returned to Sermons with two bags of cocaine. Finally, when she was apprehended several weeks later, Farrar herself expressly fingered appellant as her cocaine source in her drug business and as the man Sermons had seen in her apartment on March 10.

In response, appellant points to the fact that he was not apprehended until June 9— 6 weeks after Farrar had implicated him and 3 months after Sermons' purchase from Farrar. He argues, "It is not well settled that the justification for a search incident to apprehension still apply [sic] three months after the crime." Final Brief

at 5. On this basis, he concludes, "The probable cause to arrest was stale and the probable cause to search must be considered in the same light." *Id.* at 6.

■ Of course, a full search incident to apprehension does not, itself, depend upon probable cause to search; instead, its validity flows from the lawfulness of the apprehension. *United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 476–77, 38 L.Ed.2d 427 (1973); *accord Gustafson v. Florida,* 414 U.S. 260, 266, 94 S.Ct. 488, 492, 38 L.Ed.2d 456 (1973). Moreover, appellant fails to cite any authority at all for his novel supposition that probable cause to apprehend, like probable cause to search, can become fatally stale with the mere passage of time. Consideration of the bases of these probable-cause determinations quickly reveals the illogic of such a proposition.

■ Probable cause to search is based upon belief that evidence will be found in a particular place; because evidence does not necessarily stay put, time may be a factor in determining probable cause to believe whether the evidence sought will be found in the place to be searched. In contrast, probable cause to apprehend is based upon a belief that a crime has been committed by the apprehendee. Once a crime has been committed, it *stays* committed—that fact is unaffected by the passage of time; and probable cause to believe that the apprehendee is the one who committed it "normally would not grow stale as easily as that which supports a warrant to search a particular place for particular objects." *United States v. Watson,* 423 U.S. 411, 432 n. 5, 96 S.Ct. 820, 832 n. 5, 46 L.Ed.2d 598 (1976) (Powell, J., concurring). Accordingly, passage of time since commission of the offense usually is not relevant to probable cause to apprehend or to the lawfulness of a search incident to apprehension.

Additionally, appellant's argument erroneously implies that the challenged search was based upon probable cause; instead, as was made clear earlier, the prosecution's theory throughout—and the basis of the decision below—was that the search was

proper as being incident to a lawful apprehension.

■ Moreover, appellant's fanciful arguments notwithstanding, no rational conclusion can be permitted but that the search *was* incident to an apprehension. According to Agent Cobb's testimony, he sent for appellant for the very purpose of formally apprehending him; upon arrival, Cobb promptly informed appellant that he was under apprehension and the reasons therefor, *see* RCM 302(d)(1). Within seconds thereafter, appellant's pockets were emptied, his body patted down, and his wallet searched—all directed at locating any weapons or "destructible evidence." Appellant was then fingerprinted and finally taken to the Military Police Station for formal release to his unit. These circumstances leave no room at all to doubt Cobb's testimony that "[t]he only reason" he had sent for appellant "was to apprehend him."

■ Finally, appellant's contention that the search of his wallet was outside the lawful *scope* of a search incident to apprehension misses the mark. A search for weapons or destructible evidence "within the 'immediate control' area" of the arrestee—without regard to whether there is probable cause to believe that the person has a weapon or is about to destroy evidence—is reasonable, at least so long as the search is not "remote in time or place from the arrest." *United States v. Chadwick,* 433 U.S. 1, 15, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977), quoting *Preston v. United States,* 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964). *See United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); Mil. R.Evid. 314(g)(2), Manual, *supra.*

■ Appellant reminds us that the Supreme Court in *Chadwick* recognized that,

[o]nce law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access

to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest. 433 U.S. at 15, 97 S.Ct. at 2485 (footnote omitted). Appellant's wallet, however, which was on his person at the time of his apprehension, surely is not property that is "not immediately associated with the person of the arrestee." *See United States v. Wenzel,* 7 MJ 95, 96–97 (CMA 1979).

### C

In sum, then, we conclude that Agent Cobb had probable cause to apprehend appellant; that he did lawfully apprehend appellant; and that the challenged search of appellant's wallet was incident to the apprehension.

### II

■ Next, appellant maintains that his trial defense counsel rendered ineffective assistance of counsel when she "failed to object to testimony by government witnesses which referenced uncharged misconduct of cocaine use and obstruction of justice by appellant." Final Brief at 11. In response to the same claim made in the Court of Military Review, trial defense counsel revealed in her affidavit that her non-objection was a conscious, tactical decision: The testimony might well have been admitted anyway; and, in any event, objections would have presented repeated opportunities for trial counsel "to explain" his case to the military judge. Thus, her professional judgement was that objections to the testimony in question "would have hurt our case more than helped."

■ "[C]ompetence of counsel is presumed." *United States v. Scott,* 24 MJ 186, 188 (CMA 1987); *see Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To rebut this presumption, appellant must satisfactorily demonstrate an affirmative answer to both of these questions: Was defense counsel seriously deficient in some manner; and is there a reasonable probability that, but for that deficiency, the result of the trial would have been different. *Id. Accord United*

*States v. Harris,* 34 MJ 297 (CMA 1992); *United States v. Bono,* 26 MJ 240 (CMA 1988).

We need not reach the second question (though appellant's ability to meet his burden in relation to it seems quite unlikely), because defense counsel's affidavit ensures a negative answer to the first. Notwithstanding appellant's assertion in this Court that there is no conceivable tactical rationale behind the lack of objections, *see United States v. Rivas,* 3 MJ 282 (CMA 1977), the affidavit shows otherwise. We will not second-guess rationally based tactical decisions.

### III

Finally, appellant urges that the convening authority's grant of transactional immunity to Farrar and other witnesses as a means to compel their testimony reflected his bias in favor of those witnesses and, thus, rendered him disqualified to perform the post-trial action in this case. Appellant's contention begs the question whether the convening authority *did* grant transactional—versus testimonial—immunity. *Compare* RCM 704(a)(1) *with* RCM 704(a)(2). *See United States v. Newman,* 14 MJ 474, 482 (CMA 1983), for a discussion of the distinction between what the two types of immunity reflect concerning the convening authority's state of mind.

■ To the contrary, all the documents in the record relating to the grants of immunity expressly confer only *testimonial* immunity, and there is no indication anywhere in the record that this merely was a sham for actual grants of transactional immunity. Under these circumstances, the convening authority was not disqualified from performing his post-trial functions.

We are also not persuaded otherwise by the purported grant of transactional immunity to Farrar from a CID agent. While, under certain specific instances, this Court has bound the Government to such offers as that made here by the agent, *see United States v. Brown,* 13 MJ 253 (CMA 1982); *Cooke v. Orser,* 12 MJ 335 (CMA 1982), the

issue here is not whether and to what extent the purported grant of transactional immunity by the agent is binding. Rather, the issue is what it does or does not say about the convening authority's state of mind. We hold that it says nothing at all about the convening authority's personal state of mind and whether he has indicated any lack of objectivity. Thus, what a CID agent may have done is irrelevant to this issue.

## IV

The decision of the United States Army Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges COX, CRAWFORD, and GIERKE concur.